RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0149p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ATC DISTRIBUTION GROUP, INC.,

                *Plaintiff-Appellant,*

   *v.*

WHATEVER IT TAKES TRANSMISSIONS & PARTS, INC.;
KENNETH HESTER; CHARLES BOWMAN; CHARLES
LITCHFIELD; WILLIAM WATTS; JOHN LEECH; KIMBERLY
NICKS HALL,

                *Defendants-Appellees.*

No. 03-6505

---

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 00-00326—Thomas B. Russell, District Judge.

Argued: November 30, 2004

Decided and Filed: March 30, 2005

Before: BOGGS, Chief Judge; CLAY, Circuit Judge; and WALTER, District Judge.[*]

---

## COUNSEL

**ARGUED:** James Gibson, UNIVERSITY OF RICHMOND LAW SCHOOL, Richmond, Virginia, James B. Niehaus, FRANTZ WARD, LLP, Cleveland, Ohio, for Appellant. David A. Calhoun, WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellees. **ON BRIEF:** James B. Niehaus, Michael E. Smith, Larry W. Conner, FRANTZ WARD, LLP, Cleveland, Ohio, Colin H. Lindsay, DINSMORE & SHOHL, LLP, Louisville, Kentucky, for Appellant. David A. Calhoun, K. Gregory Haynes, Christopher W. Brooker, WYATT, TARRANT & COMBS, Louisville, Kentucky, for Appellees.

---

## OPINION

---

     BOGGS, Chief Judge. Appellant, ATC Distribution Group, Inc. ("ATC"), appeals the district court's grant of summary judgment in favor of the Appellees. ATC sells transmission parts. One of ATC's employees, Kenny Hester, left ATC to form his own transmission parts company, Whatever It Takes Transmissions ("WITT"). WITT hired away several of ATC's other employees and created a transmission parts catalog that was almost identical to the ATC catalog, on which Hester had worked while he was with

---

[*] The Honorable Donald E. Walter, United States District Judge for the Western District of Louisiana, sitting by designation.

ATC.  ATC sued WITT and several of its former employees, including Hester, alleging twelve intellectual property and unfair business practices claims.  The district court granted summary judgment in favor of WITT and the other defendants on almost all of ATC's claims.  ATC timely appealed the district court's grant of summary judgment on seven of those claims.  For the reasons set forth below, we affirm the judgment of the district court in its entirety.

# I

There are three areas of dispute between ATC and the Appellees: (1) the relationship between ATC and Kenny Hester, a former employee of ATC who started a rival transmission parts distributor, WITT; (2) the relationship between ATC, Hester, and the so-called "North Carolina Defendants," Charles Bowman, Charles Litchfield, William Watts, John Leech, and Kimberly Nicks Hall; and (3) WITT's use of ATC's transmission parts catalog and other intellectual property.

**Kenny Hester.**  This case began with the merger of two companies in 1994.  ATC Technology Group, ATC's predecessor-in-interest, acquired Hester Transmission Parts ("HTP"), along with HTP's building and the right to use HTP's transmission parts catalog, which HTP had originally acquired from McCarty, a printing company.  ATC also acquired the services of Kenny Hester and the North Carolina Defendants, who had worked at HTP for varying amounts of time.  Hester signed an employment contract and an agreement not to compete with ATC or solicit its employees prior to August 2, 1999.

Hester eventually left ATC in October 1999, after giving ATC more than a year's notice of his intent to leave, and agreeing to stay on longer than he originally planned, at ATC's request.  Hester started a new transmission parts distributor, WITT, in Louisville, Kentucky in November 1999.  WITT ultimately hired many of ATC's employees.  WITT also used advertising that incorporated ATC's part numbers, and produced a flyer indicating that WITT was "formerly HTP," although the extent of the distribution and impact of that flyer is unclear.

**The North Carolina Defendants.**  In January 2000, Hester met with the North Carolina Defendants in Charlotte.  According to Hester, they confirmed their interest in leaving ATC for a new branch of WITT that Hester was opening in Charlotte.  In March 2000, the North Carolina defendants resigned from ATC en masse over the course of two days, and began working at WITT.  One of the North Carolina Defendants, Bowman, had signed a non-compete and non-solicitation clause in 1992 upon his promotion to Vice President and Sales Manager of HTP, a position from which he subsequently had been demoted.  The North Carolina Defendants took with them copies of customer lists, reports of accounts receivable, and reports detailing the pricing groups to which ATC assigned customers.  Some of the North Carolina Defendants began calling their former customers to solicit business for WITT.

**ATC's catalog and part numbers.**  In 1995, ATC first published a transmission parts catalog that Hester had worked on since his days at HTP, a catalog that ATC hoped would become the industry standard.  This and subsequent catalogs were distributed throughout the industry.  The ATC catalog and the parts numbering system used in the catalog were based on an original catalog and numbering system that McCarty, the printing company, had distributed to several parts wholesalers, each with the wholesaler's own name on it.  The illustrations in the catalog were obtained by hiring an artist to create sketched copies of photographs found in another distributor's catalog, and then rearranging them in an order consistent with the assembly and disassembly of a transmission.  After Hester left ATC in 1999, he obtained an electronic copy of the ATC catalog, on which he based a new catalog used by WITT salespeople.  According to Hester, no copies of this catalog have ever been distributed outside WITT, but WITT does use many of ATC's part numbers in advertising and in its internal processes.

ATC brought suit against WITT, Hester, and the North Carolina Defendants in the United States District Court for the Western District of Kentucky in June 2000, alleging (1) copyright infringement (by WITT and Hester), in the form of copying without permission ATC's catalog and the part numbers and

illustrations contained in the catalog; (2) trademark infringement (by WITT); (3) unfair competition (by WITT and Hester); (4) common law trademark infringement (by WITT); (5) common law unfair competition (by WITT); (6) aiding and abetting trademark infringement and unfair competition (by WITT); (7) breach of contract (by Hester and Bowman); (8) unjust enrichment and quantum meruit (by WITT, Hester, and the North Carolina Defendants); (9) misappropriation and conversion (by WITT, Hester, and several named North Carolina Defendants); (10) breach of fiduciary duty (by Hester and the North Carolina Defendants); (11) trade defamation (by WITT, Hester, and two of the North Carolina Defendants); and (12) intentional interference with business relations (by WITT, Hester, and the North Carolina Defendants). All parties moved for summary judgment.

The court granted summary judgment in favor of all named defendants on ATC's claims for copyright infringement, trademark infringement, common law trademark infringement, common law unfair competition, aiding and abetting trademark infringement and unfair competition, unjust enrichment and quantum meruit, misappropriation and conversion, trade defamation, and intentional interference with business relations. The court granted summary judgment in favor of all defendants on all aspects of ATC's unfair competition claim except the part of the claim arising from WITT's use of the phrase "formerly HTP," on which the court granted summary judgment in favor of ATC. The court granted summary judgment in favor of defendant Bowman on the breach of contract claim, but denied summary judgment on the part of the claim arising from Hester's alleged breach of contract. Finally, the court granted summary judgment in favor of the North Carolina Defendants on the breach of fiduciary duty claim, but denied Hester's motion for summary judgment on that claim. In total, ten of the twelve counts were resolved in their entirety on summary judgment, with only one part of the unfair competition claim decided in ATC's favor. The remaining claims, including ATC's claim for damages for unfair competition, were dismissed without prejudice by the district court on August 12, 2003, pending this court's resolution of this appeal.[1]

ATC timely appealed the district court's order granting summary judgment in favor of defendants on ATC's claims for copyright infringement, unfair competition, unjust enrichment and quantum meruit, misappropriation and conversion, breach of fiduciary duty, trade defamation, and intentional interference with business relations.[2]

## II

We review a district court's order granting summary judgment *de novo*, and its findings of fact for clear error. *Howard v. City of Beavercreek*, 276 F.3d 802, 805 (6th Cir. 2002).

### A. Copyright infringement.

The Constitution establishes Congress's power to create copyrights to "promote the Progress of Science and the useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries." U.S. Const. art. I, § 8, cl. 8. The Copyright Act gives copyright owners exclusive rights to reproduce, prepare derivative works from, distribute, and publicly perform or display a copyrighted work, and allows "the legal or beneficial owner of an exclusive right under a copyright . . . to institute an action for any infringement of that particular right." *See* 17 U.S.C. §§ 106,

---

[1]The parties have agreed that if we do not vacate any portion of the district court's order or remand any part of this case to the district court, none of the dismissed claims will be refiled. (*See* J.A. 273, 275 (district court order and agreement between the parties).)

[2]Although ATC's brief states that its claims on appeal include all of the claims adjudicated by the district court, only the listed claims are addressed in its brief. ATC has therefore waived its claims for trademark infringement, common law trademark infringement, aiding and abetting trademark infringement and unfair competition, and breach of contract. *See Robinson v. Jones*, 142 F.3d 905, 906 (6th Cir. 1998) (issues raised in the district court but not raised on appeal considered abandoned and not reviewable on appeal); *Buziashvili v. Inman*, 106 F.3d 709, 719 (6th Cir. 1997) (issue listed in brief without argument in support deemed waived).

501(b).  A claim of copyright infringement requires proof of "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'ns, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).

ATC claims that WITT and Hester infringed its copyrights in the parts catalog, the individual part numbers contained in the catalog, the illustrations contained in the catalog, and its self-described "Numbering System Manual."  Appellees do not contest the allegation that they copied these works and items.  Rather, they raise the affirmative defense that ATC abandoned any copyright interests it might have had by widely distributing the catalog, and argue in the alternative that none of the works or items listed are eligible for copyright protection.

The district court rejected Appellees' abandonment claim, but agreed that the catalog, part numbers, illustrations, and the manual lacked the originality required for copyright protection, and that Appellees' admitted copying of these works and items could not have constituted copyright infringement as a matter of law.  The district court therefore held that Appellees were entitled to summary judgment on ATC's claim of copyright infringement.  Because we agree with the district court that none of the works copied by Appellees were eligible for copyright protection, we need not reach the issue of abandonment.

### 1. Catalog and part numbers.

ATC claims copyright protection for its catalog and part numbers under two different theories.  First, ATC argues that its catalog is a creative classification scheme, or taxonomy, which sorts parts into categories and sub-categories, and allocates numbers to each part.  Under this theory, the individual part numbers would be protected as the copyrightable expressions of the overall taxonomy. Second, ATC argues that even if the numbers themselves are not protected by copyright, the catalog as a whole is protected as a creative and original compilation of data.  Under neither theory are the catalog or part numbers eligible for copyright protection.

ATC's parts-classification scheme divides transmission parts into a series of categories and sub-categories.  There are three basic categories: brand, transmission type, and type of part.  In addition, a suffix field is available to further sub-divide a particular part when appropriate. Within each category, several sub-categories have been created.  In the brand category the sub-categories are relatively obvious: the transmissions are listed by manufacturer.  In the part category the sub-categories are less obvious, and require decisions such as whether to have a single category of rings, of which some are sealing rings and some are O-rings, or to have two distinct categories, sealing rings and O-rings.  Each of the three basic categories and the optional suffix are represented in each part number by a two-digit or three-digit field (with the occasional letter), within which the transmission types or parts are numbered in order, with gaps being left in each sub-category to accommodate new parts in the future.  Although all parts within a sub-category are numbered sequentially, the ordering of the sub-categories within a field, or the parts within a sub-category appears to be random.  As such, the fact that an "O-ring pump" and an "O-ring pump bolt" are in the same general range of numbers is no accident.  But the fact that O-rings in general are numbered in the 300's, and the fact that these two parts are numbered 311 and 312 rather than 341 and 342, are accidental.  Each discrete transmission part will have a number that is between five and nine digits and/or letters.

ATC claims that its numbering scheme involves several different types of creativity: (1) deciding what kind of information to convey in part numbers; (2) predicting future developments in the transmission parts industry and deciding how many slots to leave open in a given sub-category to allow for those developments; (3) deciding whether an apparently novel part that does not obviously fit in any of the existing classifications should be assigned a new category of its own or placed in an existing category, and, if the latter, which one; (4) designing the part numbers; and (5) devising the overall taxonomy of part numbers that places the parts into different categories.  An example of this last type of creativity would be the decision to include in the catalog entries for "Pressure Plate, Intermediate (Top)" (assigned number 144)

and "Pressure Plate, Intermediate (Bottom)" (145), as opposed to using one unitary entry for "Pressure Plate, Intermediate," but adding a suffix to that part number that differentiates between top (1441) and bottom (1442) plates.

### a. The ATC catalog as a taxonomy.

Classification schemes can in principle be creative enough to satisfy the originality requirement of copyright protection. *See Am. Dental Ass'n v. Delta Dental Plans Ass'n*, 126 F.3d 977, 979 (7th Cir. 1997) ("Facts do not supply their own principles of organization. Classification is a creative endeavor. . . . There can be multiple, and equally original, biographies of the same person's life, and multiple original taxonomies of a field of knowledge.").[3]   None of ATC's claimed creative endeavors seem particularly creative when compared to a great painting or novel, but the Supreme Court has made clear that only a bare minimum amount of creativity is required to satisfy the constitutional originality requirement. *See Feist*, 499 U.S. at 345 ("Original, as the term is used in copyright, means only that the work was independently created by the author (as opposed to copied from other works), and that it possesses at least some minimal degree of creativity."). At least some of the decisions made by ATC are arguably "non-obvious choices" made from "among more than a few options." *See Matthew Bender & Co. v. West Publ'g Co.*, 158 F.3d 674, 682 (2d Cir. 1998).

Original and creative *ideas*, however, are not copyrightable, because 17 U.S.C. § 102(b) provides that "in no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of [its] form." Section 102(b) codifies the common-law principle that "[u]nlike a patent, a copyright gives no exclusive right to the art disclosed; protection is given only to the expression of the idea – not the idea itself." *Mazer v. Stein*, 347 U.S. 201, 217 (1954); *see also Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 387 F.3d 522, 538 (6th Cir. 2004) ("the idea-expression divide . . . distinguishes the original work's protectable elements from its unprotectable ones"). And all of the creative aspects of the ATC classification scheme are just that: ideas. ATC cannot copyright its prediction of how many types of sealing ring will be developed in the future, its judgment that O-rings and sealing rings should form two separate categories of parts, or its judgment that a new part belongs with the retainers as opposed to the pressure plates.[4]

The *expression* of ATC's ideas about part classification and the future of the transmission parts market is not barred from copyright protection by the idea-expression distinction. It is barred, however, in part by the "merger doctrine," and in part by the originality requirement. For almost all of the types of creativity claimed by ATC, there is only one reasonable way to express the underlying idea. For example, the only way to express the prediction that a maximum of four additional types of sealing ring might be developed is to leave four numbers unallocated, and the only way to express the idea that a novel part should be placed with the sealing rings rather than with the gaskets is to place that part with the sealing rings. Under the merger doctrine, "when there is essentially only one way to express an idea, the idea and its expression are inseparable [i.e., they merge,] and copyright is no bar to copying that expression." *Kohus v. Mariol*, 328 F.3d 848, 856 (6th Cir. 2003) (alteration in original, internal citation omitted).

---

[3] The district court disagreed with *American Dental*'s holding that taxonomies can be copyrighted, on the ground that they are "useful articles" excluded from copyright protection by 17 U.S.C. § 101. However section 101 only limits the extent to which useful articles can receive copyright protection in the context of "[p]ictorial, graphic, and sculptural works," and further defines a useful article as an article that has a function other than conveying information. As such, the usefulness of a taxonomy, which is intended to convey information, and which is neither pictorial, graphic, nor sculptural, does not preclude its being eligible for copyright protection under section 101.

[4] As the district court notes, permitting copyright protection for ATC's choice of where in the catalog to locate a new part would be akin to granting copyright protection to a grocer who decides to display a new type of heirloom tomato with the gourmet produce, as opposed to with the other tomatoes or the locally grown produce.

The only aspect of the numbering system that does not merge with the underlying idea is the allocation of numbers to each sub-category, and ultimately to each part. ATC argues that its individual part numbers are copyright protected as expressions of the catalog as a whole, and cites as authority the Seventh Circuit's holding in *American Dental*, which held that the American Dental Association's *Code on Dental Procedures and Nomenclature* was copyrightable. *See* 126 F.3d at 979. The *Code* classified dental procedures into groups, with each procedure receiving a number, a short description, and a long description. *Id.* at 977. For example, number 04267 was assigned to the short description "guided tissue regeneration–nonresorbable barrier, per site, per tooth (includes membrane removal)." *Ibid.* The Seventh Circuit held that the numbers assigned to each procedure were copyrightable, in addition to the long and short descriptions of each procedure. *Id.* at 979.

The *American Dental* court's rationale for holding that the individual procedure numbers were copyrightable is rather opaque:

> Number 04267 reads "guided tissue regeneration–nonresorbable barrier, per site, per tooth" but could have read "regeneration of tissue, guided by nonresorbable barrier, one site and tooth per entry". Or "use of barrier to guide regeneration of tissue, without regard to the number of sites per tooth and whether or not the barrier is resorbable". The first variation is linguistic, the second substantive; in each case the decision to use the actual description is original to the ADA, not knuckling under to an order imposed on language by some "fact" about dental procedures. Blood is shed in the ADA's committees about which description is preferable. The number assigned to any one of the three descriptions could have had four or six digits rather than five; guided tissue regeneration could have been placed in the 2500 series rather than the 4200 series; again any of these choices is original to the author of a taxonomy, and another author could do things differently. Every number in the ADA's Code begins with zero, assuring a large supply of unused numbers for procedures to be devised or reclassified in the future; an author could have elected instead to leave wide gaps inside the sequence. A catalog that initially assigns 04266, 04267, 04268 to three procedures will over time depart substantively from one that initially assigns 42660, 42670, and 42680 to the same three procedures. So all three elements of the Code–numbers, short descriptions, and long descriptions, are copyrightable subject matter under 17 U.S.C. § 102(a).

*Ibid.* Almost all of this passage concerns either the wording of the descriptions, or the creative thought that went into the underlying taxonomy, such as the decision to leave gaps in the numbering system. The discussion of the numbers themselves is limited to two immaterial observations: that numbers in the 4200's rather than the 2500's were assigned to guided tissue regeneration; and that the numbers assigned to a particular procedure in a catalog will differ depending on the prior allocation of numbers to other procedures. Neither of these facts evidences any creativity by the ADA that would render the numbers eligible for copyright protection. The mere fact that numbers are attached to, or are a by-product of categories and descriptions that are copyrightable does not render the numbers themselves copyrightable. *See Southco, Inc. v. Kanebridge Corp.*, 258 F.3d 148, 151 & n.5 (3d Cir. 2001) ("*Southco* I") ("For purposes of copyright law . . . [a] numbering system itself and the actual numbers produced by the system are two very different works," such that even if the underlying system is original and creative, the numbers themselves are not copyrightable unless they are assigned to parts in a creative way).[5]

Even assuming, *arguendo*, that some strings of numbers used to designate an item or procedure could be sufficiently creative to merit copyright protection, the parts numbers at issue in the case before us do not evidence any such creativity. ATC's allocation of numbers to parts was an essentially random

---

[5] The Third Circuit subsequently noted in *Southco, Inc. v. Kanebridge Corp.*, 324 F.3d 190 (3d Cir. 2003) ("*Southco* II"), that the district court had, on remand after *Southco* I, misinterpreted the earlier decision as precluding the possibility of creative numbering. The *Southco* II court therefore remanded once again for examination of that issue, but did not question the underlying principle that part numbers cannot be protected by copyright absent such creativity.

process, serving only to provide a useful shorthand way of referring to each part. The only reason that a "sealing ring, pump slide" is allocated number 176 is the random ordering of sub-categories of parts, and the random ordering of parts within that sub-category. Were it not for a series of random orderings within each category field, a given part could be 47165 or 89386. As such, the particular numbers allocated to each part do not *express* any of the creative ideas that went into the classification scheme in any way that could be considered eligible for copyright protection. *See Mitel, Inc. v. Iqtel, Inc.*, 124 F.3d 1366, 1374 (10th Cir. 1997) ("[T]he random and arbitrary use of numbers in the public domain does not evince enough originality to distinguish authorship.") (internal citation omitted). These numbers are no more copyrightable than would be the fruit of an author's labors if she wrote a book and then "translated" it into numbers using a random number generator for each letter in every word. Even if the text in English was copyrightable, the randomly generated list of numbers that comprised the "translation" could not be.

Originality aside, there are other sound reasons for denying copyright protection to short "works," such as part numbers. Although the fact that ATC had a copyright in the number 45607 might not ultimately preclude other people or entities from using that number in other contexts, given the defenses of fair use and independent creation available to those accused of copyright infringement, anyone using that number in a commercial context would face the time-consuming and expensive prospect of having to defend themselves against such claims. This would not only be extremely inefficient, but would provide a way for the creators of otherwise uncopyrightable ideas or works to gain some degree of copyright protection through the back door simply by assigning short numbers or other shorthand phrases to those ideas or works (or their component parts). *See SmithKline Beecham Consumer Healthcare, L.P. v. Watson Pharms., Inc.*, 211 F.3d 21, 29 n.5 (2d Cir. 2000) ("the danger lurking in copyright protection for labels is that the tail threatens to wag the dog – proprietors at times seize on copyright protection for the label in order to leverage their thin copyright protection over the text . . . on the label into a monopoly on the typically uncopyrightable product to which it is attached.") (internal quotation and citation omitted). Indeed, the Copyright Office will not register a short name, phrase, or expression, such as the name of a product or service, even if it is novel or distinctive. *See* 37 C.F.R. § 202.1 (regulation issued by the Copyright Office under 17 U.S.C. § 702, stating that short phrases such as names are not subject to copyright protection); Copyright Office Circular 34 (available at http://www.copyright.gov/circs/circ34.html). While the use without compensation of one's labors may seem unfair, "this is not 'some unforeseen byproduct of a statutory scheme.' It is, rather, 'the essence of copyright,' and a constitutional requirement. The primary objective of copyright is not to reward the labor of authors, but 'to promote the Progress of Science and useful Arts.'" *Feist*, 499 U.S. at 349 (internal citations omitted). Permitting uncopyrightable materials to receive protection simply by virtue of adding a number or label would allow an end run around that constitutional requirement.

As a last resort, ATC suggested during oral argument that even if neither the ideas that gave rise to the parts numbers, nor the individual part numbers, *qua* expressions of those ideas, are copyrightable, the part numbers taken as a whole were somehow copyrightable as a middle ground between the two, much in the same way that while neither the basic idea behind a novel nor the individual words used to write it are protected, the story that those words form when taken together is copyrightable. The flaw in this argument is that there is no such middle ground in this case. Unlike the words that comprise a novel, which add up to a story, the numbers used in ATC's catalog only add up to a long list of numbers. Putting all the numbers together does not make them expressive in the way that putting words together makes a narrative.

**b. The ATC catalog as a creative compilation of parts data.**

The second way in which the ATC catalog could be eligible for copyright protection is as a compilation of data. *See* 17 U.S.C. § 103 (providing for copyright protection for a compilation, limited to "the material contributed by the author of such work, as distinguished from the preexisting material employed in the work"); *see also id.* § 101 ("A 'compilation' is a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that

the resulting work as a whole constitutes an original work of authorship. The term 'compilation' includes collective works.").[6]

The requirement that the selection, coordination, or arrangement of data constitutes an independent work of authorship over and above the data themselves is not a stringent one. "A compiler may settle upon a selection or arrangement that others have used; novelty is not required. Originality requires only that the author make the selection or arrangement independently (i.e., without copying that selection or arrangement from another work), and that it display some minimal level of creativity." *Feist*, 499 U.S. at 358. The *Feist* Court cautioned, though, that "the selection and arrangement of facts cannot be so mechanical or routine as to require no creativity whatsoever. The standard of originality is low, but it does exist." *Id.* at 362.

The district court found ATC's catalog insufficiently original to receive protection as a compilation on two grounds. First, the design, ordering, and sorting of transmission parts in the catalog is almost identical to the McCarty catalog on which it was based. Second, even without the similarity of the two catalogs, the "commonplace," "practically inevitable" manner in which the parts are listed is insufficiently creative to merit protection.

The ATC catalog and the McCarty catalog are similar in many ways. For example, both catalogs contain tables showing the transmission type and page number for each model of vehicle. In addition, both begin the listings for each transmission with an illustration of the parts for that transmission. These copied aspects of the catalog are ineligible for copyright protection. *See Feist*, 499 U.S. at 358. As the district court acknowledged, however, there are differences between the two catalogs in the manner in which the transmission parts for each transmission type are listed. ATC's catalog lists the parts in different categories than does the McCarty catalog, and describes the parts differently. The district court dismissed these differences as negligible, and found that the entire catalog was copied from the McCarty catalog; but this conclusion begs the question whether the way in which ATC arranges[7] the transmission parts is sufficiently creative to constitute an original compilation. If not, then the catalog is not protected by copyright whether it was copied or not. If so, then the differences between the catalogs can hardly be described as negligible given that the one aspect in which they differ is sufficient to make the ATC catalog a protected compilation.

For the most part, cases considering the originality of data selection in purported compilations confirm that the creativity bar has been set extremely low. *See, e.g.*, *Publ'ns Int'l v. Meredith Corp.*, 88 F.3d 473, 481 (7th Cir. 1996) (order and arrangement of uncopyrighted recipes is sufficiently creative to constitute original compilation); *CCC Info. Servs., Inc. v. MacLean Hunter Mkt. Reports, Inc.*, 44 F.3d 61, 67 (2d Cir. 1994) (sufficient creativity displayed in collection of used car values when compiler divided the used car market into geographical regions, selected optional features for inclusion, adjusted for mileage in 5,000 mile increments (rather than, say, 7,000), used the abstract concept of the "average vehicle" as the subject of a valuation, and decided how many years' models to include in the guide). The ATC catalog does not even have this minimal level of creativity, however, because the only aspect of the catalog that differs from the McCarty catalog is the choice of headings and arrangement of the parts into categories – two minor differences that we have previously held to be insufficiently creative to justify copyright protection. In *J. Thomas Distributors v. Greenline Distributors*, No. 95-2100, 1996 U.S. App. LEXIS 29035, 1996 WL 636138 (6th Cir. October 31, 1996) (unpublished opinion), we held that a catalog that featured additional

---

[6]The *American Dental* court stated that the ADA taxonomy of dental procedures could not be protected as a compilation under 17 U.S.C. § 103, because "[i]t could be a compilation only if its elements existed independently and the ADA merely put them in order." 126 F.3d at 980. This requirement that the elements of a compilation must exist independently of the act of compilation cannot be reconciled with the statutory language, which states that a compilation is a collection or assembly of "preexisting materials *or of* data." 17 U.S.C. § 103 (emphasis added).

[7]The selection of data is not an issue in this case. Unlike, for example, the selection of nine particular pitching statistics on a form intended to allow baseball fans to predict the outcome of games, *see Kregos v. Associated Press*, 937 F.2d 700, 704 (2d. Cir. 1991), ATC included in its catalog every transmission part available.

subheadings and a rearranged sequence of information was, while "organized in a manner unknown to the industry prior to its publication," and "perhaps original," nonetheless "typical, if not inevitable," and lacking in the "requisite creativity for copyright protection." *See* 1996 U.S. App. LEXIS 29035, at \*3-\*4. To be sure, ATC could have arranged the parts information in other ways that were potentially less clear or useful, but this fact alone is insufficient to demonstrate the creativity necessary for copyright protection. *See BellSouth Adver. & Publ'g Corp. v. Donnelley Info. Publ'g, Inc.*, 999 F.2d 1436, 1443 (11th Cir. 1993) ("The relevant inquiry [for copyright purposes] is not whether there is some imaginable, although manifestly less useful, method of arranging business telephone listings."). ATC's catalog is not eligible for copyright protection as a compilation.

### 2. Illustrations.

There are two aspects of the catalog illustrations that could potentially receive copyright protection: the illustrations themselves, and the arrangement of the illustrations in the order in which a transmission is assembled or disassembled.

The illustrations in the catalog are hand-drawn sketches of transmissions parts, copied from photographs cut out of competitors' catalogs. A reproduction of a work of art or photograph in a different medium is copyrightable in principle, if it involves "great skill and originality," *Alva Studios, Inc. v. Winninger*, 177 F. Supp. 265, 267 (S.D.N.Y. 1959), or "substantial variation, not merely a trivial variation such as might occur in the translation to a different medium," *L. Batlin & Son v. Snyder*, 536 F.2d 486, 492 (2d Cir. 1976). Mere "sweat of the brow," however, is insufficient to render a copy eligible for copyright protection. *Feist*, 499 U.S. at 352-61. Nor is the mere demonstration of physical skill or special training. *L. Batlin & Son*, 536 F.2d at 491. The illustrations in ATC's catalog fall far short of the "substantial variation" required to justify copyright protection. The illustrations were intended to be as accurate as possible in reproducing the parts shown in the photographs on which they were based, a form of slavish copying that is the antithesis of originality. *See J. Thomas Distribs.*, 1996 U.S. App. LEXIS 29035, at \*5 ("Plaintiff's spindle bearing was drawn with the express intention of duplicating on paper the appearance of an actual spindle bearing. Its reproduction involved absolutely no creative spark whatsoever.").

Nor is the arrangement of the illustrations sufficiently original to merit copyright protection. As the district court noted, the idea of displaying technical drawings in the order of assembly or disassembly "may be original to the transmission parts industry but it is otherwise unoriginal. If anything, it moves the illustrations farther into the category of works unprotected by copyright because they represent nothing but a compilation of facts in a realistic manner." *See Sparaco v. Lawler, Matusky & Skelly Eng'rs LLP*, 303 F.3d 460, 462 (2d Cir. 2002) (holding that aspects of a site map that simply depict the site as it exists are unprotected by copyright). If a selection or arrangement of otherwise unprotected facts or content is "so mechanical or routine as to require no creativity whatsoever," or "practically inevitable . . . [and] time-honored," it cannot be protected by copyright. *Feist*, 499 U.S. at 362-63. "The standard of originality is low, but it does exist." *Id.* at 362. Hence, in *J. Thomas Distributors*, we held that "cut away drawings like plaintiff's drawing of the spindle bearing are common in mail order catalogs in the industry. Plaintiff's inclusion of the drawing in its catalog is entirely unoriginal. In essence, the drawing is neither original nor creative. Therefore, copyright law provides it no protection." 1996 U.S. App. LEXIS 29035, at \*5-\*6. Like those spindle drawings, ATC's arrangement of its illustrations to depict the process of transmission assembly or disassembly is unoriginal and therefore unprotected by copyright.

### 3. Manual.

ATC complains that the district court failed to address the claim that its Numbering System Manual was protected by copyright. This is true, but understandable. Despite the rather grandiose title ATC gives this document, presumably with the intention of evoking *Baker v. Selden*'s holding that an explanation of how to use an otherwise unprotected system may itself be protected, *see* 101 U.S. 99, 104 (1880), the materials ATC describes in this way are nothing more than an index-like list of all the part numbers and

categories of parts in the catalog, which ATC acknowledges to be a quick reference guide for ATC employees. This index does not explain the parts numbering system, but simply compiles the list of parts numbers in an unimaginative way. As such, the manual is no more copyrightable than the catalog for which it serves as a quick reference.

## B. Preemption.

As the district court correctly noted, ATC's state law claims alleging the appropriation by Appellees of ATC's intellectual property rights in its catalog, part numbers, or illustrations are preempted by federal copyright law because (1) those works are within the scope of the subject matter of copyright, as specified in 17 U.S.C. §§ 102, 103, and (2) the rights ATC asserts under state law are equivalent to the exclusive rights under federal copyright law set out in 17 U.S.C. § 106. *Wrench v. Taco Bell Corp.*, 256 F.3d 446, 453 (6th Cir. 2001). The fact that none of these works are eligible for copyright protection under federal law does not preclude the preemption of ATC's state law claims. "As long as a work fits within one of the general subject matter categories of sections 102 and 103, the bill prevents the States from protecting it even if it fails to achieve Federal statutory copyright because it is too minimal or lacking in originality to qualify, or because it has fallen into the public domain." *NBA v. Motorola, Inc.*, 105 F.3d 841, 849 (2d Cir. 1997); *see also ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1453 (7th Cir. 1996) ("One function of § 301(a) is to prevent states from giving special protection to works of authorship that Congress has decided should be in the public domain, which it can accomplish only if 'subject matter of copyright' includes all works of a type covered by sections 102 and 103, even if federal law does not afford protection to them."); *cf. Bonito Boats, Inc. v. Thunder Craft Boats, Inc.*, 489 U.S. 141, 156 (1989) (same principle under patent laws).

Three of ATC's state law claims are entirely or partially preempted by federal copyright law. The unfair competition claim is completely preempted by federal law because the only basis for this claim was Appellee's alleged misappropriation of ATC's part numbers.[8] The district court's grant of summary judgment in favor of Appellees on that claim was therefore appropriate. ATC's unjust enrichment and misappropriation claims are also preempted insofar as they rely on Appellee's appropriation or use of the catalog, part numbers, and illustrations.

We affirm the district court's grant of summary judgment on ATC's unjust enrichment claim on the basis of federal preemption alone, because although Appellees' use of ATC's intellectual property was not the only basis for the unjust enrichment claim, ATC limits its appeal of that claim to the preemption issue, and has therefore waived any other potential objections to summary judgment. *See Robinson*, 142 F.3d at 906.

ATC's misappropriation claim was properly dismissed on preemption grounds insofar as it rested on Appellees' alleged misappropriation of the catalog, part numbers, and illustrations. That claim was not preempted by federal law with regard to Appellees' alleged misappropriation of ATC's trade secrets.

## C. Misappropriation of trade secrets.

ATC claims that Appellees misappropriated trade secrets by taking with them, when they left the employ of ATC, customer lists and certain financial information, such as accounts receivable data. The district court declined to grant summary judgment on this claim as it related to the misappropriation of the financial information. The district court did grant summary judgment in favor of Appellees on the claim that they misappropriated ATC's customer lists, on the ground that those lists were not trade secrets under Kentucky law. We agree with the district court.

---

[8]ATC attempts on appeal to expand its unfair competition claim to include other allegations in addition to the misappropriation of its part numbers. These allegations may not be made for the first time on appeal. *See St. Marys Foundry, Inc. v. Employers Ins. of Wausau*, 332 F.3d 989, 995-96 (6th Cir. 2003).

Kentucky courts have never addressed whether the Kentucky Uniform Trade Secrets Act protects customer lists. The Kentucky Act, like other statutes based on the Uniform Trade Secrets Act, defines a trade secret as information that, among other things, derives economic value "from not being generally known to, and not being readily ascertainable by proper means by, other persons who can readily obtain economic value from its disclosure or use." *See* Ky. Rev. Stat. Ann. § 365.880 (Michie 2002). In determining whether information is readily obtainable by proper means, courts generally distinguish between, on one hand, lists of customers "discoverable only through extraordinary efforts and . . . through many years' expenditure of time and money," such as purchasers of HIV medications who value confidentiality, *see In re Am. Preferred Prescriptions v. Health Mgmt., Inc.*, 186 B.R. 350, 356 (Bankr. E.D.N.Y. 1995), or the purchasers of unusual goods or services not generally known to an industry at large, *see Morlife v. Perry*, 66 Cal. Rptr. 2d. 731, 735 (Cal. App. 1997), and, on the other hand, lists of customers whose identities as purchasers of a given type of product may be obtained through such legitimate channels as telephone books, the internet, or by calling local businesses, *see, e.g.*, *UBS PaineWebber, Inc. v. Aiken*, 197 F. Supp. 2d 436, 447 (W.D.N.C. 2002) (customer list not trade secret under statute almost identical to Kentucky Act despite attempts at secrecy, because information was readily available through independent development); *Novacare Orthotics & Prosthetics v. Speelman*, 528 S.E.2d 918, 922 (N.C. App. 2000) (customer list not trade secret because information used to contact customers was "easily accessible to defendant through a local phone book"). As the district court found, ATC can point to no evidence that the identities of transmission parts customers contained on its customer list was obtained through great effort or expense, or that the names on the list were not discoverable from a telephone book or similar legitimate source. Even the name of the person at each transmission shop responsible for buying parts, to which ATC ascribes great importance, can be ascertained simply by calling each shop and asking.

## D. Breach of fiduciary duty.

The district court granted summary judgment in favor of the North Carolina Defendants on this claim, on the ground that they did not owe a fiduciary duty to ATC because "[t]he ordinary employer-employee relationship that existed between the North Carolina Defendants as salespeople and ATC does not give rise to fiduciary duties under Kentucky law."[9] Because the district court concluded that the status of the North Carolina Defendants as salespeople precluded their having fiduciary duties to ATC, it did not consider ATC's claims that those Defendants did in fact have fiduciary duties to ATC because they were in positions of trust at ATC, and had access to confidential information and trade secrets.

There is no *per se* rule in Kentucky that a "mere" salesperson cannot owe a fiduciary duty to his or her employer. *See Stewart v. Ky. Paving Co.*, 557 S.W.2d 435, 438 (Ky. 1977) (finding that a salesperson had a fiduciary duty to his employer because "the ties Stewart had to the management of Kentucky Paving Company placed him in a position of trust and permitted him access to confidential corporate information."). Under Kentucky law, a fiduciary relationship requires a relationship "founded on trust or confidence reposed by one person in the integrity and fidelity of another and which also necessarily involves an undertaking in which a duty is created in one person to act primarily for another's benefit in matters connected with such undertaking." *Steelvest, Inc. v. Scansteel Serv. Ctr., Inc.*, 807 S.W.2d 476, 485 (Ky. 1991).

The district court dismissed *Stewart* as finding a fiduciary duty "only under an unusual factual situation," but did not specify what in particular it deemed unusual about that situation. The district court attempted to demonstrate a contrary rule, (presumably covering less unusual factual situations), by citing *Steelvest* for the proposition that a company officer had a fiduciary duty to his employer because he was more than a "mere employee," 807 S.W.2d at 483, and *Aero Drapery of Ky., Inc. v. Engdahl, Ky.*, 507

---

[9]The district court found that Kentucky law applies to all of the common law claims made against the North Carolina Defendants. Appellees argue on appeal that North Carolina law should apply to those claims, but acknowledge that "this error . . . was harmless, as North Carolina and Kentucky law are nearly (if not) identical in regard to the claims brought against the Carolina Defendants." (N.C. Defs.' Br. at 24.) Given this concession, and the fact that our resolution of the claims against these defendants would not change if we applied North Carolina law, we decline to address this issue.

S.W.2d 166 (1974), as "upholding judgment in favor of salespeople in [a] breach of fiduciary claim." Neither of these cases is sufficient to generate the rule on which the district court seeks to rely, namely that, absent unusual circumstances, one's status as a salesperson precludes a fiduciary relationship. *Steelvest* simply notes that, unlike "mere" employees, officers of a company may be *presumed* to have a fiduciary relationship to the company on that basis alone, while *Aero Drapery* simply affirms a judgment in favor of a salesperson without giving any reasons for that decision. The fact that the salesperson in question had that particular position may well have had nothing to do with the lower court's judgment in his favor. *See Stewart*, 557 S.W.2d at 438 ("The [*Aero Drapery*] opinion did not reveal the duties and the nature of a salesman within the corporate structure of Aero Drapery but merely concluded without setting forth the reasons that there was no fiducial duty between this particular salesman and the corporation."). While it is not clear that the evidence put forth by ATC of the North Carolina Defendants' alleged positions of trust and access to confidential information would suffice to prove that they had fiduciary duties to ATC, the district court's grant of summary judgment in favor of Appellees cannot be sustained solely on the basis of its conclusion that such evidence need not even be considered.

Summary judgment in favor of Appellees was appropriate nonetheless, because ATC adduced no evidence that any of the North Carolina Defendants acted in a way that would constitute a breach of any fiduciary duty they might have had to ATC. The only alleged breaches of duty by the North Carolina Defendants that were alleged by ATC before the district court were (1) holding a clandestine meeting to plan for the opening of WITT, and (2) stealing trade secrets from ATC on behalf of WITT.[10] ATC offers no explanation why ordinary employees of a company may not meet with each other, openly or "clandestinely," to plan for the opening of a rival company for which they would rather work. Nor does ATC explain why taking accounts receivable information – the only information that could possibly be deemed a trade secret – constitutes a breach of fiduciary duty absent any evidence that either the North Carolina Defendants, who were all salespeople, not accountants, or anyone else actually used the accounts information in question. Taking accounts information that is never used by anyone may constitute unlawful misappropriation, but it is not a breach of fiduciary duty.

### E. Trade defamation.

The basis of ATC's defamation claim in the district court was a series of statements made by North Carolina Defendants Leech and Litchfield in letters to prospective customers, such as the explanation of their departure from ATC, and Hester's formation of WITT, as being prompted by "seeing and hearing all of his customers and ex-employees complain and suffer over things that should never have happened."

In Kentucky, defamation is divided into two categories, defamation *per se* and defamation *per quod*. *CMI, Inc. v. Intoximeters, Inc.*, 918 F. Supp. 1068, 1083 (W.D. Ky. 1995). The district court correctly concluded that ATC could not recover for defamation *per quod*, because it presented no evidence of any pecuniary loss as a direct and proximate result of the defamation. *Ibid.* (citing *Sweeney & Co. v. Brown*, 60 S.W.2d 381, 383 (Ky. 1933)). The district court was also correct in holding that Appellees' statements did not rise to the level of libel *per se*, because they did not expose ATC to "public hatred, ridicule, contempt or disgrace, or [] induce an evil opinion of [ATC] in the minds of right-thinking people," as is required under Kentucky defamation law. *Columbia Sussex, Inc. v. Hay*, 627 S.W.2d 279, 274 (Ky. Ct. App. 1981). Furthermore, "[i]f a business is damaged, the damage is usually reflected in the loss of revenues or profits," and thus "courts should be very cautious about labeling as defamation *per se* comments made about a corporation or its products." *CMI*, 918 F. Supp. at 1084. Therefore, we will not disturb the district court's findings on the issue of trade defamation.

---

[10] On appeal, ATC alleges that the North Carolina Defendants committed other breaches along with Hester, including planning the opening of the Charlotte branch of WITT while they were still employed by ATC, soliciting ATC employees on behalf of WITT, and securing a building for WITT, but these allegations were previously directed only at Hester. These claims may not be directed towards the North Carolina Defendants for the first time on appeal. *See St. Marys Foundry*, 332 F.3d at 995-96.

### F. Intentional interference with business relations.

ATC claims that all of the Appellees interfered with actual and prospective contracts between ATC and other companies. The district court applied the seven-factor test of improper interference set forth in the Restatement (Second) of Torts, and found that none of the Appellees' behavior had risen to the level of intentional interference with business relations. *See Nat'l Collegiate Athletic Ass'n v. Hornung*, 754 S.W.2d 855, 857-58 (Ky. 1988) (holding that Restatement factors fairly reflect Kentucky law regarding interference with prospective contract).[11] ATC appeals this decision with regard to the North Carolina Defendants and Hester.

In *Steelvest*, the Kentucky Supreme Court stated that:

> Under Kentucky law, tort liability exists for the interference with a known contractual relationship, if the interference is malicious or without justification, or is accomplished by some unlawful means such as fraud, deceit, or coercion. We would presume to place the breach of fiduciary relationship on an equal par with fraud and deceit. Accordingly, we determine, as a matter of law, that a breach of a fiduciary duty is equivalent to fraud.

807 S.W.2d at 487. The district court properly granted summary judgment on this claim in favor of the North Carolina Defendants, because there is no evidence in the record of either the malice or unjustified conduct required to prove intentional interference. As the district court correctly noted, simply attempting to advance one's own legitimate economic interests at the expense of another's interests does not constitute malice. *See Hornung*, 754 S.W.2d at 859.

In light of *Steelvest*, the district court's holding that any interference with business relations committed by Hester did not rise to the level of an intentional tort cannot be reconciled with the district court's refusal to find for summary judgment purposes that Hester did not breach a fiduciary duty to ATC. Insofar as there remains a material issue of fact about Hester's breach of duty, there must also exist a material question of fact as to whether any inference with ATC's contracts ascribed to Hester was intentional. This is not to say, though, that summary judgment was inappropriate. Because the district court concluded that neither party's conduct rose to the level of an *intentional* tort, it did not address whether Hester actually interfered with ATC's business relationships in the first place. In fact, ATC has not produced any evidence of such interference. The only conduct by Hester that ATC has consistently alleged to constitute interference is his misappropriation of trade secrets.[12] ATC has not produced any evidence that Hester's appropriation and use of those secrets adversely affected its relationships with any actual or potential customers. Therefore, we affirm the district court's grant of summary judgment in favor of Hester.

### III

For the reasons set forth above, we AFFIRM the district court's order in its entirety.

---

[11]The Restatement factors are: (a) the nature of the actor's conduct; (b) the actor's motive; (c) the interests of the other with which the actor's conduct interferes; (d) the interests sought to be advanced by the actor; (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other; (f) the proximity or remoteness of the actor's conduct to the interference; and (g) the relations between the parties. Restatement (Second) of Torts § 767.

[12]In its complaint, ATC alleged that Hester interfered with its business relationships by misappropriating and using its trade secrets, and that WITT and Hester also did so by interfering with ATC's relationship with Charles Bowman, one of the North Carolina Defendants. The allegation concerning Bowman is not made on appeal, and is therefore waived. *See Robinson*, 142 F.3d at 906. On appeal, ATC repeats its claim that Hester misappropriated its trade secrets, and also alleges for the first time that Hester interfered with its business relations by forming WITT while still an officer of ATC, and telling ATC customers of that intention. These latter claims are impermissibly raised for the first time on appeal. *See St. Marys Foundry*, 332 F.3d at 995-96.