**THE BRIDGEMAN ART LIBRARY, LTD., Plaintiff,**

v.

**COREL CORPORATION, et ano., Defendants.**

No. 97 Civ. 6232(LAK).

United States District Court, S.D. New York.

Feb. 18, 1999.

As Amended March 2, 1999.

Stephen A. Weingrad, Weingrad & Weingrad, New York City, NY, for plaintiff.

Kathryn J. Fritz, Fenwick & West LLP, Palo Alto, CA, Ira G. Greenberg, Edwards & Angell, LLP, New York City, NY, for defendant Corel Corporation.

## MEMORANDUM OPINION

KAPLAN, District Judge.

On November 13, 1998, this Court granted defendant's motion for summary judgment dismissing plaintiff's copyright infringement claim on the alternative grounds that the allegedly infringed works—color transparencies of paintings which themselves are in the public domain—were not original and therefore not permissible subjects of valid copyright and, in any case, were not infringed.[1] It applied United Kingdom law in determining whether plaintiff's transparencies were copyrightable.[2] The Court noted, however, that it would have reached the same result under United States law.[3]

Following the entry of final judgment, the Court was bombarded with additional sub-missions. On November 23, 1998, plaintiff moved for reargument and reconsideration, arguing that the Court erred on the issue of originality. It asserted that the Court had ignored the Register of Copyright's issuance of a certificate of registration for one of plaintiff's transparencies, which it takes as establishing copyrightability, and that the Court had misconstrued British copyright law in that it failed to follow *Graves' Case*,[4] which was decided in the Court of Queens Bench in 1869.[5] At about the same time, the Court received an unsolicited letter from Professor William Patry, author of a copyright law treatise, which argued that the Court erred in applying the law of the United Kingdom to the issue of copyrightability. Plaintiff then moved for an order permitting the filing of an *amicus* brief by one of its associates, The Wallace Collection, to address the United Kingdom law issue. The Court granted leave for the submission of the *amicus* brief and invited the parties to respond to Professor Patry's letter. The matter now is ripe for decision.

At the outset, it is worth noting that the post-judgment flurry was occasioned chiefly by the fact that the plaintiff failed competently to address most of the issues raised by this interesting case prior to the entry of final judgment. In particular, while plaintiff urged the application of U.K. law, it made no serious effort to address the choice of law issue and no effort at all (apart from citing the British copyright act) to bring pertinent U.K. authority to the Court's attention before plaintiff lost the case. Indeed, it did not even cite *Graves' Case*, the supposedly controlling authority that the Court is said to have overlooked.[6]

Everything plaintiff has submitted on this motion should have been before the Court earlier, which is more than sufficient reason to deny its motion as an unwarranted imposition on the Court and, indeed, its adversary.

---

1. *The Bridgeman Art Library, Ltd. v. Corel Corp.*, 25 F.Supp.2d 421 (S.D.N.Y.1998).

2. *Id.* at 425–26.

3. *Id.* at 427 nn. 41, 47.

4. L.R. 4 Q.B. 715 (1869).

5. The former argument, of course, is at least arguably inconsistent with plaintiff's position that its copyrights arose under British law.

6. *See* Pl.Mem. in Opp. to Motion for Judg. on the Pleadings at 39–40.

The issues, however, are significant beyond the immediate interests of the parties. Accordingly, the Court will address them on the merits.

*Choice of Law*

 Professor Patry argues principally that there can be no choice of law issue with respect to copyrightability because the Copyright Clause of the Constitution [7] permits Congress to enact legislation protecting only original works of authorship. In consequence, he contends, only original works, with originality determined in accordance with the meaning of the Copyright Clause, are susceptible of protection in United States courts.

Of course, the ability of Congress to extend the protection of copyright is limited by the Copyright Clause. Nevertheless, the constitutional issue is not as straightforward as Professor Patry suggests. Bridgeman claims that the infringed works are protected by United Kingdom copyrights and that the United States, by acceding to the Convention for the Protection of Literary and Artistic Works, popularly known as the Berne Convention,[8] and the Universal Copyright Convention [9] and by enacting the Berne Convention Implementation Act of 1988 (the "BCIA"),[10] agreed to give effect to its United Kingdom copyrights.

The fact that plaintiff's rights allegedly derive from its claimed British copyrights arguably is material. Granting Professor Patry's point that Congress, in light of the originality requirement of the Copyright Clause, in ordinary circumstances may not extend copyright protection to works that are not original, the questions remain whether (1) the United States constitutionally may obligate itself by treaty to permit enforcement of a foreign copyright where that copyright originates under the law of a signatory nation which does not limit copyright protection to works that are original in the sense required by the United States Constitution and, if so, (2) the United States in fact has done so. Thus, Professor Patry's contention that the United States may not apply foreign law less restrictive than its own with respect to originality may be too narrow because it rests exclusively on the Copyright Clause. The legal effect and constitutionality of treaties also is implicated.

Article II, Section 2, of the Constitution provides that the President "shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided two thirds of the Senators present concur." Treaties, by virtue of the Supremacy Clause, join the Constitution and federal statutes as "supreme law of the land." [11] As the Supreme Court wrote in *Geofroy v. Riggs:*[12]

> "The treaty power, as expressed in the Constitution, is in terms unlimited except by those restraints which are found in that instrument against the action of the government ..., and those arising from the nature of the government itself and the States. It would not be contended that it extends so far as to authorize what the Constitution forbids, or a change in the character of the government or in that of one of the States, or a cession of any portion of the territory of the latter, without its consent ... But with these exceptions, it is not perceived that there is any limit to the questions which can be adjusted touching any matter which is properly the subject of negotiation with a foreign country." [13]

And while it now is clear that the treaty power is "subject to the constitutional limitations that apply to all exercises of federal power, principally the prohibitions of the Bill of Rights," [14] the treaty power retains considerable scope.

---

7. U.S. CONST. Art. I, § 8, Cl. 8.

8. Berne Convention (Paris text) art. 5(1), *reprinted in* 9 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT App. 27 (1998) (hereinafter cited as the "NIMMER").

9. Sept. 6, 1952, 6 U.S.T. 1341.

10. Pub.L. 100–568, 102 Stat. 2853 (1988).

11. U.S. CONST. Art. VI, Cl. 2.

12. 133 U.S. 258, 10 S.Ct. 295, 33 L.Ed. 642 (1890).

13. *Id.* at 267, 10 S.Ct. 295.

14. LOUIS HENKIN, FOREIGN AFFAIRS AND THE U.S. CONSTITUTION 185 (2d ed.1996).

The Copyright Clause and the Copyright Act both recognize that the United States has an important interest in protecting the intellectual property of its citizens and of those whose creative efforts enrich our lives. In this increasingly interconnected world, securing appropriate protection abroad also is important. Hence, it cannot seriously be denied that international copyright protection is "properly the subject of negotiation with" foreign countries.

Decades ago, the Supreme Court held in *Missouri v. Holland*[15] that Congress could enact legislation necessary and proper to the implementation of a treaty which, absent the treaty, would have been beyond its powers. Although the case arose in a different context,[16] it suggests that the Conventions, if their purported effect actually is to permit enforcement in the United States of foreign copyrights which do not meet U.S. standards of originality—in other words, if they require enforcement here of any copyright valid under the law of the signatory nation in which copyright attached, even if that copyright does not meet U.S. standards of validity—would not be obviously invalid.

In view of these considerations, the proposition advanced by Professor Patry—that the Copyright Clause forecloses any choice of law issue with respect to the validity of a foreign Berne Convention work, is not free from doubt. It is necessary to decide that question, however, only if the Conventions require application of foreign law in determining the existence of copyright and, if so, whether there is any true conflict of law in this case on that point.

In most circumstances, choice of law issues do not arise under the Berne and Universal Copyright Conventions. Each adopts a rule of national treatment.[17] Article 5 of the Berne Convention, for example, provides that "[a]uthors shall enjoy, in respect of works for which they are protected under this Convention, in countries of the Union other than the country of origin, the rights which their respective laws do now or may hereafter grant to their nationals, as well as the rights specially granted by this convention" and that "the extent of protection, as well as the means of redress afforded to the author to protect his rights, shall be governed exclusively by the laws of the country where protection is claimed."[18] Hence, the Conventions make clear that the holder of, for example, a British copyright who sues for infringement in a United States court is entitled to the same remedies as holders of United States copyrights and, as this Court previously held, to the determination of infringement under the same rule of law.

While the nature of the protection accorded to foreign copyrights in signatory countries thus is spelled out in the Conventions, the position of the subject matter of copyright thereunder is less certain. Do the Conventions purport to require signatory nations to extend national treatment with respect to such enforcement-related subjects as remedies for infringement only where the copyright for which protection is sought would be valid under the law of the nation in which enforcement is sought? Or do they purport to require also that a signatory nation in which enforcement is sought enforce a foreign copyright even if that copyright would not be valid under its own law?[19] But there is an even more fundamental issue, viz. whether United States courts may give effect to any provisions of the Conventions which might require or suggest that the existence

---

**15.** 252 U.S. 416, 432, 40 S.Ct. 382, 64 L.Ed. 641 (1920).

**16.** The issue was whether a statute regulating the hunting of migratory birds, enacted to implement a U.S.–Canadian treaty, violated the Tenth Amendment by invading a province reserved to the states. Here, on the other hand, the question would be whether the Copyright Clause, in limiting copyright protection to original works, prohibits the United States from agreeing to extend protection to foreign works which do not meet that requirement.

**17.** Berne Convention arts. 5(1)–5(2); Univ. Copyright Conv. (Geneva and Paris texts), art. II, *reprinted in* 9 NIMMER Apps. 24–25.

**18.** Berne Convention art. 5(1)–5(2).

**19.** *See Hasbro Bradley, Inc. v. Sparkle Toys, Inc.*, 780 F.2d 189, 192 (2d Cir.1985) (applying U.S. copyright law "[a]lthough the toys enjoyed no copyright protection under Japanese law").

of copyright be determined under the law of another nation.

Although the Supreme Court has not yet decided the point, it seems quite clear at this point that the Berne Convention is not self-executing.[20] Section 3(a) of the BCIA[21] confirms this view, stating that:

> "The provisions of the Berne Convention—
>
> "(1) shall be given effect under title 17, as amended by this Act, and any other relevant provision of Federal or State law, including the common law, and
>
> "(2) shall not be enforceable in any action brought pursuant to the provisions of the Berne Convention itself."

Section 4(c),[22] now codified at 17 U.S.C. § 104(c), states in relevant part that "[n]o right or interest in a work eligible for protection under this title may be claimed by virtue of, or in reliance upon, the provisions of the Berne Convention or the adherence of the United States thereto." Thus, while the Copyright Act, as amended by the BCIA, extends certain protection to the holders of copyright in Berne Convention works as there defined, the Copyright Act is the exclusive source of that protection.

The statutory basis of the protection of published Berne Convention works such as the photographs here at issue is Section 104(b), which states in relevant part that:

> "The works specified by sections 102 and 103, when published, are subject to protection under this title if—
>
> \* \* \* \* \* \*
>
> "(4) the work is a Berne Convention work ..."[23]

Section 102(a) limits copyright protection in relevant part to "original works of authorship...."[24] Accordingly, there is no need to

decide whether the Berne Convention adopts any rule regarding the law governing copyrightability or whether the treaty power constitutionally might be used to extend copyright protection to foreign works which are not "original" within the meaning of the Copyright Clause. Congress has made it quite clear that the United States' adherence to the Berne Convention has no such effect in the courts of this country. And while there is no comparable legislation with respect to the Universal Copyright Convention,[25] the question whether that treaty is self-executing is of no real significance here because the substantive provisions of the UCC are "of very limited practical import ..."[26]

## Originality and Copyrightability

### United States Law

■ The Court's prior opinion indicated that plaintiff's exact photographic copies of public domain works of art would not be copyrightable under United States law because they are not original.[27] In view of the Court's conclusion here that U.S. law governs on this issue, it is appropriate to give a somewhat fuller statement of the Court's reasoning.

In *Burrow–Giles Lithographic Co v. Sarony,*[28] the Supreme Court held that photographs are "writings" within the meaning of the Copyright Clause and that the particular portrait at issue in that case was sufficiently original—by virtue of its pose, arrangement of accessories in the photograph, and lighting and the expression the photographer evoked—to be subject to copyright. The Court, however, declined to decide whether "the ordinary production of a photograph" invariably satisfies the originality requirement. While Judge Learned Hand later sug-

---

**20.** *Bridgeman,* 25 F.Supp.2d at 430 & n. 71; *In re AEG Acquisition Corp.,* 127 B.R. 34, 42 (Bankr.C.D.Cal.1991), *aff'd,* 161 B.R. 50 (9th Cir. BAP1993); S.Rᴇᴘ. No. 100–352, 100th Cong., 2d Sess. 53–54 (1988); H.R.Rᴇᴘ. No. 100–609, 100th Cong., 2d Sess. 28–32 (1988), 1988 U.S.C.C.A.N. 3706; *see also Carter v. Helmsley–Spear, Inc.,* 71 F.3d 77, 83 (2d Cir.1995); 1 Nɪᴍᴍᴇʀ § 1.12[A].

**21.** 102 Stat. 2853.

**22.** *Id.* at 2855.

**23.** 17 U.S.C. § 104(b).

**24.** *Id.* § 102(a).

**25.** 1 Nɪᴍᴍᴇʀ § 1.12[B].

**26.** *Id.* § 1.12[B], at 1–110 to 1–111.

**27.** 25 F.Supp.2d at 427 nn. 41, 47.

**28.** 111 U.S. 53, 4 S.Ct. 279, 28 L.Ed. 349 (1884).

gested that the 1909 Copyright Act protected photographs independent of their originality,[29] his view ultimately was rejected by the Supreme Court.[30] Nevertheless, there is broad scope for copyright in photographs because "a very modest expression of personality will constitute sufficient originality."[31]

As the Nimmers have written, there "appear to be at least two situations in which a photograph should be ·denied copyright for lack of originality," one of which is directly relevant here: "where a photograph of a photograph or other printed matter is made that amounts to nothing more than slavish copying."[32] The authors thus conclude that a slavish photographic copy of a painting would lack originality, although they suggest the possibility that protection in such a case might be claimed as a "reproduction of a work of art."[33] But they immediately go on to point out that this suggestion is at odds with the Second Circuit's *in banc* decision in *L. Batlin & Son, Inc. v. Snyder.*[34]

*Batlin* involved the defendants' claim to copyright in a plastic reproduction, with minor variations, of a mechanical cast-iron coin bank that had been sold in the United States for many years and that had passed into the public domain. The Court of Appeals affirmed a district court order compelling the defendants to cancel a recordation of copyright in the plastic reproduction on the ground that the reproduction was not "original" within the meaning of the 1909 Copyright Act, holding that the requirement of originality applies to reproductions of works of art.[35] Only "a distinguishable variation"— something beyond technical skill—will render the reproduction original.[36] In consequence:

"Absent a genuine difference between the underlying work of art and the copy of it for which protection is sought, the public interest in promoting progress in the arts—indeed, the constitutional demand [citation omitted]—could hardly be served. To extend copyrightability to minuscule variations would simply put a weapon for harassment in the hands of mischievous copiers intent on appropriating and monopolizing public domain work. Even in *Mazer v. Stein*, [347 U.S. 201, 74 S.Ct. 460, 98 L.Ed. 630 (1954) ], which held that the statutory terms 'works of art' and 'reproduction of works of art' . . . permit copyright of quite ordinary mass-produced items, the Court expressly held that the objects to be copyrightable, 'must be original, that is, the author's tangible expression of his ideas.' 347 U.S. at 214, 74 S.Ct. at 468, 98 L.Ed. at 640. No such originality, no such expression, no such ideas here appear."[37]

The requisite "distinguishable variation," moreover, is not supplied by a change of medium, as "production of a work of art in a different medium cannot by itself constitute the originality required for copyright protection."[38]

There is little doubt that many photographs, probably the overwhelming majority, reflect at least the modest amount of originality required for copyright protection. "Elements of originality . . . may include posing the subjects, lighting, angle, selection of film and camera, evoking the desired expression, and almost any other variant in-

29. *Jewelers' Circular Pub. Co. v. Keystone Pub. Co.*, 274 F. 932, 934 (S.D.N.Y.1921), *aff'd*, 281 F. 83 (2d Cir.), *cert. denied*, 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922).

30. *Feist Publications, Inc. v. Rural Tel. Serv. Co.*, 499 U.S. 340, 350–53, 111 S.Ct. 1282, 113 L.Ed.2d 358 (1991).

31. 1 NIMMER § 2.08[E][1], at 2–130.

32. *Id.* § 2.08[E][2], at 2–131.

33. *Id.*

34. 536 F.2d 486 (2d Cir.) (*in banc* ), *cert. denied*, 429 U.S. 857, 97 S.Ct. 156, 50 L.Ed.2d 135 (1976).

35. *Id.* at 490–91.

36. *Id.* (quoting *Gerlach–Barklow Co. v. Morris & Bendien*, 23 F.2d 159, 161 (2d Cir.1927)).

37. *Id.* at 492.

38. *Past Pluto Productions v. Dana*, 627 F.Supp. 1435, 1441 (S.D.N.Y.1986) (citing *L. Batlin & Son, Inc.*, 536 F.2d at 491). *Accord, Durham Ind., Inc. v. Tomy Corp.*, 630 F.2d 905, 910 (2d Cir.1980).

volved."[39] But "slavish copying," although doubtless requiring technical skill and effort, does not qualify.[40] As the Supreme Court indicated in *Feist*, "sweat of the brow" alone is not the "creative spark" which is the *sine qua non* of originality.[41] It therefore is not entirely surprising that an attorney for the Museum of Modern Art, an entity with interests comparable to plaintiff's and its clients, not long ago presented a paper acknowledging that a photograph of a two-dimensional public domain work of art "might not have enough originality to be eligible for its own copyright."[42]

In this case, plaintiff by its own admission has labored to create "slavish copies" of public domain works of art. While it may be assumed that this required both skill and effort, there was no spark of originality—indeed, the point of the exercise was to reproduce the underlying works with absolute fidelity. Copyright is not available in these circumstances.

### United Kingdom Law

■ While the Court's conclusion as to the law governing copyrightability renders the point moot, the Court is persuaded that plaintiff's copyright claim would fail even if the governing law were that of the United Kingdom.

Plaintiff's attack on the Court's previous conclusion that its color transparencies are not original and therefore not copyrightable under British law depends primarily on its claim that the Court failed to apply *Graves' Case*, a *nisi prius* decision and the supposedly controlling authority that plaintiff did not even cite in its opposition to defendant's motion for summary judgment.

*Graves' Case* in relevant part involved an application to cancel entries on the no longer extant Register of Proprietors of Copyright in Paintings, Drawings and Photographs for three photographs of engravings.[43] In rejecting the contention that the photographs were not copyrightable because they were copies of the engravings, Justice Blackburn wrote:

"The distinction between an original painting and its copy is well understood, but it is difficult to say what can be meant by an original photograph. All photographs are copies of some object, such as a painting or statue. And it seems to me that a photograph taken from a picture is an original photograph, in so far that to copy it is an infringement of the statute."[44]

Plaintiff and the *amicus* therefore argue that plaintiff's photographs of public domain paintings are copyrightable under British law. But they overlook the antiquity of *Graves' Case* and the subsequent development of the law of originality in the United Kingdom.

Laddie, a modern British copyright treatise the author of which now is a distinguished British judge, discusses the issue at Bar in a helpful manner:

"It is obvious that although a man may get a copyright by taking a photograph of some well-known object like Westminster Abbey, he does not get a monopoly in representing Westminster Abbey as such, any more than an artist would who painted

**39.** *Rogers v. Koons*, 960 F.2d 301, 307 (2d Cir.), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992), accord, *Leibovitz v. Paramount Pictures Corp.*, 137 F.3d 109, 116 (2d Cir.1998).

**40.** In *Hearn v. Meyer*, 664 F.Supp. 832 (S.D.N.Y. 1987), Judge Leisure held on the authority of *Batlin* that "slavish copies" of public domain reproductions of public domain original works of art were not copyrightable despite the great skill and effort involved in the copying process, and minor but unintentional variations between the copies and the works copied.

**41.** 499 U.S. 340, 111 S.Ct. 1282, 113 L.Ed.2d 358.

**42.** Beverly Wolff, *Copyright*, in ALI–ABA Course of Study; *Legal Problems of Museum Administration*, C989 ALI–ABA 27, at *48 (available on Westlaw). *See also* Lynne A. Greenburg, *the Art of Appropriation: Puppies, Piracy, and Post–Modernism*, 11 CARDOZO ARTS & ENT. L.J. 1, 20–21 (1992) (photographic copies of original art photographs taken by the famous photographer, Edward Weston, which were made to "deconstruct the myth of the masterpiece" not copyrightable).

**43.** The action was based on the Fine Arts Copyright Act of 1862, 25 & 26 Vict. c. 68, rather than the current British copyright statute.

**44.** L.R. 4 Q.B. at 722.

or drew that building. What, then, is the scope of photographic copyright? As always with artistic works, this depends on what makes his photograph original. Under the 1988 Act the author is the person who made the original contribution and it will be evident that this person need not be he who pressed the trigger, who might be a mere assistant. Originality presupposes the exercise of substantial independent skill, labour, judgment and so forth. *For this reason it is submitted that a person who makes a photograph merely by placing a drawing or painting on the glass of a photocopying machine and pressing the button gets no copyright at all;* but he might get a copyright if he employed skill and labour in assembling the thing to be photocopied, as where he made a montage. It will be evident . that in photography there is room for originality in three respects. First, there may be originality which does not depend on creation of the scene or object to be photographed or anything remarkable about its capture, and which resides in such specialties as angle of shot, light and shade, exposure, effects achieved by means of filters, developing techniques etc.: in such manner does one photograph of Westminster Abbey differ from another, at least potentially. Secondly, there may be creation of the scene or subject to be photographed. We have already mentioned photo-montage, but a more common instance would be arrangement or posing of a group ... Thirdly, a person may create a worthwhile photograph by being at the right place at the right time. Here his merit consists of capturing and recording a scene unlikely to recur, e.g. a battle between an elephant and a tiger ..." [45]

Moreover, the authors go on to question the continued authority of *Graves' Case* under just this analysis:

"It is submitted that *Graves' Case* (1869) LR 4 QB 715 (photograph of an engraving), a case under the Fine Arts Copyright Act 1862, does not decide the contrary, since there may have been special skill or labour in setting up the equipment to get a good photograph, especially with the rather primitive materials available in those days. Although the judgments do not discuss this aspect it may have been self-evident to any contemporary so as not to require any discussion. *If this is wrong it is submitted that* Graves' Case *is no longer good law and in that case is to be explained as a decision made before the subject of originality had been fully developed by the courts.*" [46]

This analysis is quite pertinent in this case. Most photographs are "original" in one if not more of the three respects set out in the treatise and therefore are copyrightable. Plaintiff's problem here is that it seeks protection for the exception that proves the rule: photographs of existing two-dimensional articles (in this case works of art), each of which reproduces the article in the photographic medium as precisely as technology permits. Its transparencies stand in the same relation to the original works of art as a photocopy stands to a page of typescript, a doodle, or a Michelangelo drawing.[47]

Plaintiff nevertheless argues that the photocopier analogy is inapt because taking a photograph requires greater skill than making a photocopy and because these transparencies involved a change in medium. But the argument is as unpersuasive under British as under U.S. law.

The allegedly greater skill required to make an exact photographic, as opposed to Xerographic or comparable, copy is immaterial. As the Privy Council wrote in *Interlego AG v. Tyco Industries, Inc.*,[48] "[s]kill, labor or judgment merely in the process of copying cannot confer originality...." [49] The point is

---

45. Hugh Laddie, Peter Prescott, & Mary Vitoria, The Modern law of Copyright and Designs § 3.56, at 238 (1995) (footnotes omitted, emphasis added).

46. *Id.* at 239 n. 3 (emphasis added).

47. Plaintiff concedes that a photocopy is not original and hence not copyrightable. (Tr., 9/14/98, at 22).

48. 1 A.C. 217 (P.C.1989), 3 All E.R. 949, 970 (1988) (appeal taken from Hong Kong).

49. *Id.* 3 All.E.R. at 971–72.

exactly the same as the unprotectibility under U.S. law of a "slavish copy."

Nor is the change in medium, *standing alone*, significant. The treatise relied upon by plaintiff for the contrary proposition does not support it. It states that "a change of medium will *often* entitle a reproduction of an existing artistic work to independent protection." [50] And it goes on to explain:

> "Again, an engraver is almost invariably a copyist, but his work *may* still be original in the sense that he has employed skill and judgment in its production. An engraver produces the resemblance he wishes by means which are very different from those employed by the painter or draughtsman from whom he copies; means which require a high degree of skill and labour. The engraver produces his effect by the management of light and shade, or, as the term of his art expresses it, the *chiaroscuro*. The required degree of light and shade are produced by different lines and dots; the engraver must decide on the choice of the different lines or dots for himself, and on his choice depends the success of his print." [51]

Thus, the authors implicitly recognize that a change of medium alone is not sufficient to render the product original and copyrightable. Rather, a copy in a new medium is copyrightable only where, as often but not always is the case, the copier makes some identifiable original contribution. In the words of the Privy Council in *Interlogo AG*, "[t]here must ... be some element of material alteration or embellishment which suffices to make the totality of the work an original work." [52] Indeed, plaintiff's expert effectively concedes the same point, noting that copyright "may" subsist in a photograph of a work of art because "change of medium is *likely* to amount to a material alteration from the original work, unless the change of medium is so insignificant as not to confer originality ..." [53]

Here, as the Court noted in its earlier opinion, "[i]t is uncontested that Bridgeman's images are substantially exact reproductions of public domain works, albeit in a different medium." [54] There has been no suggestion that they vary significantly from the underlying works. In consequence, the change of medium is immaterial.

Finally, the *amicus* argues that this result is contraindicated because public art collections in the United Kingdom charge fees for reproductions of photographic images of works in their collections, thus evidencing their view that the images are protected by copyright. But the issue here is not the position of an economically interested constituency on an issue that has not been litigated, at least in this century, but the content of the originality requirement of the British Copyright Act. Moreover, it is far from clear what the understanding of British art collections, if any, actually is. Certainly, for example, there are original works of art in British public art collections in which copyright subsists and is owned by the collections, in which case reproduction rights no doubt are a fit subject for exploitation. [55]

For all of the foregoing reasons, the Court is persuaded that its original that Bridgeman's transparencies are not copyrightable under British law was correct.

**50.** E.P. Skone James et al., Copinger and Skone James on Copyright § 3–34, at 62 (1991) (emphasis added).

**51.** *Id.* (emphasis added).

**52.** 3 All.E.R. at 971–72.

**53.** Sutcliffe Aff. ¶ 12 (emphasis added).

**54.** 25 F.Supp.2d at 426.

Lady Bridgeman, plaintiff's principal, testified that the goal of the transparencies is to be as true to the original work as possible. (Bridgeman Dep. 15) The color bars (referred to in the prior opinion) are employed to make sure that "the transparency is a genuine reflection of the colors" of the original works of art. (Eichel Dep. 29) Plaintiff has argued "that in creating the transparencies ..., Bridgeman strives to make the transparency look as identical to the underlying work of art as possible ..." (Pl. Mem. in Opp. to Summary Judgment 4)

**55.** The *amicus*'s suggestion that this Court's holding will deprive public art collections of fee revenue for reproduction of photographs of their works of art more properly is directed to Parliament, which of course has plenary power over the protection available under British copyright law.

*The Certificate of Registration for* The Laughing Cavalier

As indicated above, plaintiff argues also that the fact that the Register of Copyright issued a certificate of registration for one of plaintiff's transparencies demonstrates that its photographs are copyrightable under U.S. law. The argument is misguided.

No one disputes that most photographs are copyrightable. In consequence, the issuance of a certificate of registration for a photograph proves nothing. And while the certificate is *prima facie* evidence of the validity of the copyright,[56] including the originality of the work, the presumption is not irrebuttable.[57] Here, the facts pertinent to the issue of originality are undisputed. The Court has held as a matter of law, and reiterates, that plaintiff's works are not original under either British or United States law.

*Conclusion*

Plaintiff's motion for reargument and reconsideration of this Court's order granting summary judgment dismissing the complaint is granted. Nevertheless, on reargument and reconsideration, defendant Corel Corporation's motion for summary judgment dismissing the complaint is granted.

SO ORDERED.

---

56. 17 U.S.C. § 410(c).

57. *E.g., Lakedreams v. Taylor,* 932 F.2d 1103, 1108 (5th Cir.1991).

Indeed, the Copyright Act leaves the "evidentiary weight to be accorded the certificate ... [to] the discretion of the court." 17 U.S.C. § 410(c).